THE HUMPHREYSVILLE COPPER COMPANY *v.* THE VERMONT COPPER MINING COMPANY.

*Evidence.    Custom.    Sale.    Damages.*

The defendants contracted in writing to deliver the plaintiffs five hundred tons of copper ore, to be paid for at certain specified prices per ton according to the quality of the ore, to be ascertained by an assay thereof, " the moisture to be deducted as usual from the weight of the ore." The plaintiffs claimed that under this contract the defendants were bound to deliver a quantity of ore weighing five hundred tons after deducting for the moisture, while the defendants insisted that they were only bound to deliver five hundred tons of ore, gross weight, without any deduction for the moisture, and that the proviso in regard to such deduction related only to the mode of ascertaining the weight of ore to be paid for. *Held,* that it was competent for either party to introduce testimony tending to prove a uniform and known custom of trade in regard to the sale and delivery of copper ore, corresponding with their respective claims as to the construction of the contract in question.

The only general damages which the vendee of personal property is entitled to recover for its non-delivery, whether the price be paid or not, is the difference between the contract price and the market value of the article at the stipulated time and place of delivery, when the price has advanced, together with the money paid on the contract.

Neither can special damages be recovered for the breach of such a contract of sale, unless they are the natural and ordinary result of the breach, and as such fairly within the contemplation of both parties at the time of entering into the contract.

But it is incumbent on the party seeking to recover such special damages, to so conduct his business as to escape as much of them as practicable. He cannot recover for losses, which, though connected with the breach of the contract by the other party, still have resulted directly from his own imprudence.

ASSUMPSIT. The declaration set forth a written contract whereby the defendants promised to deliver to the plaintiffs at New Haven, Connecticut, five hundred tons of copper ore, mined from the defendants' mines in the state of Vermont, to be delivered in good merchantable order, by the 1st day of September, 1855 ; and for which the plaintiffs agreed to pay the defendants certain specified prices per ton, according to the quality of the ore, to be ascertained by assay thereof, " the moisture to be deducted as usual from the weight of the ore." The declaration alleged that the defendants did not deliver the required amount of ore ; and that at the time of making such contract the plain-

Copper Co. *v.* Copper Mining Co.

tiffs had on hand and were receiving large quantities of rich ore; that such ores as those contracted for with the defendants were necessary for properly working the richer ores, and that the object of the plaintiffs in making this contract with the defendants was to have the ores, mined by the latter, to use as a flux in combination with their richer ores; and that by means of the defendants' neglect to deliver their ores agreeably to their contract the plaintiffs were put to great loss, trouble and expense, in purchasing other cheap ores to be used in the place of the defendants' ores, together with great loss of fuel, wear and damages of their furnaces, hindrance and delay in their work, and loss of time of the workmen employed by them. In addition to these special damages, the declaration also set forth general damages.

The defendants pleaded the general issue accompanied by notice of special matter in defence, to the effect that they did deliver to the plaintiffs at New Haven from time to time from the date of the contract until the 26th of August, 1856, five hundred twelve tons of copper ore mined from their mines in Vermont, in good merchantable order, and that the plaintiffs accepted such ore on the contract above set forth, without objection. The cause was tried by jury at the June Term, 1859, ALDIS, J., presiding.

On trial the plaintiffs proved the execution by the defendants of the contract declared on, and introduced evidence tending to show that between the date of the contract and the 1st of September, 1855, the defendants delivered only about one hundred eighty-one tons of ore; but it further appeared from the same testimony that after September 1st, 1855, the defendants delivered ore to the plaintiffs from time to time, until August 26th, 1856, and that the whole quantity delivered by them was four hundred ninety-eight tons, deducting the moisture, and that the whole weight of the ore delivered, without deducting the moisture, was five hundred twelve tons.

The plaintiffs insisted that by the contract the defendants were bound to deliver an amount of ore which would weigh five hundred tons, after deducting for the moisture, while the defendants, on the other hand, claimed that they were only bound to deliver

an amount of ore which would weigh five hundred tons, without deducting the moisture; and that the proviso in regard to deducting the moisture was only for the purpose of determining the weight to be paid for, and not to ascertain the weight delivered.

The defendants offered to show (if the court should regard the contract as doubtful upon its face in this respect,) that the universal custom of the trade in buying and selling copper ore was to deliver specific amounts by common weight, without deducting the moisture, but in paying for the same to pay only for the net weight, the moisture being deducted. To the admission of such testimony the plaintiffs objected, but the court admitted it, to which the plaintiffs excepted; and thereupon both parties introduced evidence tending to show that the custom of the trade was as they respectively claimed the legal construction of the contract to be.

The plaintiffs offered testimony tending to show that the Vermont ores of the defendants were sulphurets of copper and suitable to mix with other copper ores (silicates or carbonates of copper) as a flux; that the plaintiffs were engaged in smelting copper ores, and between November 1st, 1854, and September 1st, 1855, purchased richer copper ores, which, being silicates, in order to be easily smelted and reduced to copper, required a quantity of the Vermont ores, or other similar sulphurets of copper, to be mixed with them as a flux; that after the 1st of September, 1855, on account of the stringency of the money market and other similar reasons, they bought little copper ore besides what they received of the defendants; that on account of the non-delivery of the Vermont ores by the defendants according to their contract, and within the specified time, the plaintiffs were obliged to buy other sulphuret-of-copper ores to use as a flux with their richer silicate-of-copper ores, at prices much higher than the price specified in their contract with the defendants; that before making such contract the plaintiffs had tried the defendants' Vermont ores, and found them suitable as a flux, and with the intention of using them for that purpose, and also with the hope that they would prove to be richer than they turned out to be, they were led to make the contract in question.

The plaintiffs also offered testimony tending to show that the Vermont ore, when used alone, and not mixed with other ores, could not be smelted and reduced to copper without almost doubling the expense; that it was nearly worthless when it had to be smelted alone and in reverberatory furnaces, like those used by the plaintiffs, on account of this great increase of expense in smelting it; that in consequence of the non-delivery of the Vermont ores by the defendants within the specified time, and of the fact that the plaintiffs had no other kinds of ores, they were obliged to smelt such of the defendants' ores as were received after September 1st, 1855, alone, partly in reverberatory furnaces and partly in blast furnaces, and at a great increase of expense, the coal used and the labor of the men being about double what they otherwise would have been, and the necessary repairs and permanent injury to the furnaces being considerably increased, which increased expense and damages, being estimated at about six thousand dollars, the plaintiffs claimed to recover.

The defendants introduced evidence tending to show that the plaintiffs accepted the balance of the five hundred tons of ore not delivered by the 1st of September, 1855, without objection to its previous non-delivery, and expressly waived all objection on that account; while the plaintiffs, on the other hand, gave evidence tending to show the contrary.

There was no evidence to show any change of price in the Vermont ores between the 1st day of September, 1855, and the 26th day of August, 1856.

The defendants introduced evidence tending to show that the plaintiffs had on hand at and after the 1st of September, 1855, a sufficient quantity of sulphuret-of-copper ores, not received from Vermont, which were suitable as a flux for the silicate-of-copper ores, to smelt all the ore of the latter kind which they then had on hand, and that the plaintiffs were not obliged to buy, and did not buy, other ores for such a purpose.

The County Court charged the jury that the question, whether the defendants had delivered the quantity of ore required by the contract, depended upon the custom of trade in regard to deducting for the moisture, as above stated; and that if the jury found that the custom in this respect was as the plaintiffs claimed, then

the plaintiffs were entitled to recover on this ground, but if the custom was as the defendants claimed, then the defendants had fulfilled their contract in this respect, and the plaintiffs were not entitled to recover on this ground.

In regard to the question whether the plaintiffs in accepting a portion of the required quantity of ore after the 1st of September, 1855, waived, or did not waive, all objection to its previous non-delivery, the court charged in such manner, as was not excepted to by either party.

The court then proceeded to instruct the jury that if in consequence of the non-delivery of the ore according to the contract, the plaintiffs were obliged to buy and did buy other ores to supply the place of the Vermont ores, they were entitled to recover for the excess of price they had to pay therefor beyond the contract price, and for all expenses, freight and loss of time incurred in buying such other ores.

The court further charged the jury that at all events the plaintiffs were not entitled to recover as damages for the non-delivery of the ore by the time specified in the contract, the additional expense which was incurred by working up such ore alone over and above the expense which would have been incurred, if it had been mixed with other ores; that such damages, including the injury to the furnaces and the extra labor of men, &c., were too remote to be the subject of recovery; and therefore that, if the jury did not find for the plaintiff upon the ground of the non-delivery of the requisite quantity of coal, or upon the ground that the plaintiffs were obliged, in consequence of the non-delivery of the Vermont ores, to purchase other ores at a higher price to supply their place, the rule of damages upon the ground of the non-delivery of the requisite quantity of ore by the prescribed time, was as follows, viz: if the ore delivered by the defendants after the expiration of the stipulated time was worth when delivered, in cash, at the common market price, and at the place of delivery, as much as the contract price, then the plaintiffs could recover only nominal damages; but that if, at those times, it was worth less than the contract price, the plaintiffs were entitled to recover such difference.

The jury returned a verdict for the plaintiffs for one cent damages.

To the charge of the court as above detailed the plaintiffs excepted.

*Hebard & Martin,* for the plaintiffs.

*C. W. Clark* and *A. M. Dickey,* for the defendants.

REDFIELD, Ch. J    I. In regard to the construction of the contract, we incline to the opinion, that the provision for " deducting the moisture," upon the face of the contract, and according to the fair import of the terms used, must signify, that this is to be done only for the purpose of determining the amount to be paid. This seems to us to carry no implication of incongruity, such as was stated in the argument for the plaintiff.

The ore was sold in the moist state. It was to be delivered in that state. The moisture could not be ascertained, until it was worked. The definite sum of the dry weight could not be known at the time of delivery. It is then more natural to conclude that the parties must have referred to the weight, at the time the title to the article passed. This seems to be the only construction whereby the parties could act understandingly. In any other view, the defendant would be necessitated to deliver more than the five hundred tons, as the amount could not be definitely known until the moisture was expelled in the course of manufacture, and the plaintiffs would not be bound to receive the excess, even after they had expelled the moisture.

But when the payment came to be determined, as that was to be made according to its productiveness of metal, there is nothing incongruous, as it seems to us, in deducting the moisture. And the form of expression used in the contract, "the moisture to be deducted, as usual, from the weight of the ores," seems to imply that the ores had been before weighed, or were expected to be, else why speak of the " weight," and of deducting from the weight. This is certainly not very decisive, but it does indicate how the parties understood the thing was to be done, and that the ores were to be weighed in the moist state. If so,

it seems natural to conclude that the contract in defining the gross amount sold did refer to the weight when made, and in the state when sold.

If this, then, is the construction of the contract upon its face, the admission of testimony to show that such is the custom of the trade, could not be objected to by the plaintiff. But if the question of construction were doubtful, the custom might well be proved, provided it were uniform and known, so as fairly to be presumed to have been in the mind of the parties, in entering into the contract. So that in either view, we cannot regard the course of the trial as presenting any error, of which the plaintiff can complain.

And in regard to the construction of contracts, affecting business as little known as the smelting of copper ore, and as much matter of science and study, where any doubt is claimed to exist, and the existence of any usage, or custom, is claimed affecting the question, it is highly useful and proper, and in accordance with the English practice, to take the opinion of the jury specially upon the existence, nature and extent of such usage, or custom, and place the special finding of the jury upon the record, that the Supreme Court may give it what effect it is entitled to.

II. The only remaining question, which seems to be much insisted upon by the plaintiffs' counsel, is in regard to the rule of damages. For as the jury, under the charge of the court, have found no special damages, and there is no testimony in the case, tending to show that the price of copper had risen at the time of the alleged failure to deliver the ore as stipulated, then it would not seem to be important to spend time upon the question, whether the case was properly put to the jury in relation to the three hundred and twenty tons of ore having been received towards the five hundred tons stipulated to be delivered by the 1st of September, 1855, although not delivered until after that time. We see no reason to question the perfect regularity and soundness of the charge upon this portion of the case. But unless the rule of damages adopted in the County Court was erroneous, and can be put upon some other basis, we do not perceive that the other questions can be made of much impor-

Copper Co. *v.* Copper Mining Co.

tance. And the counsel seem so to regard it. The court might have said there was no evidence of any damage from the rise of ore in the market, and the other damages claimed were too remote to form any ground of recovery, and it would have brought the case to the same result which was reached by the charge, as it seems to me.

In regard to the rule of damages the court think the facts stated do not lay a sufficient basis for the recovery of special damages of the nature of those claimed in the present case. The only general damages which the vendee of personal property is entitled to recover for failure to deliver the articles, according to the contract, whether the price be paid or not, is the differ- ence between the contract price and the market price of the article, at the stipulated time and place of delivery, when the price has advanced, together with the money paid towards the price. This contract, upon the facts stated in the bill of excep- tions, is such a case. There is nothing in the case to show that the parties were aware that this article was important to the plaintiff, in carrying forward his business, beyond the mere fact of being supplied with ore to manufacture, or how much ore the defendant knew the plaintiff would require for the supply of his works, or what proportion he expected from this source, or how difficult it might be to supply the place of this ore in the mar- ket, or whether this ore could be worked profitably alone. And it does appear that the plaintiffs used other ores very extensively. Under these circumstances we are not prepared to say, that the special damages claimed in the action, were the natural or ordi- nary, and therefore the known and necessary, result of the failure to perform the contract, or that they were in any sense fairly within the contemplation of both parties at the time of entering into the contract, and so the natural result of the breach of the contract, as understood by the parties. And unless the damages resulting from the breach of a contract are of this character, it is now well settled they are too remote to be recovered. The case of *Hadley* v. *Boxendale*, 26 Eng. L. and Eq. 398, is of this character. And the English courts, in a later case, have applied the same rule to the case of a railway passenger going to perform important business and failing to arrive in time, in consequence

of the train not making the proper connection. It was held the party could only recover his extra expense in reaching his destination, and nothing for his loss of time and failure to meet his customers and extra expense in going by post to meet them at their places of business. This was held too remote to be regarded as in the mind of both parties at the time of entering into the contract. It was not, according to any facts known to the defendant, either the ordinary or natural result of the failure of the plaintiff to arrive in time. But it was in fact the inevitable result of the mode in which the plaintiff had before arranged to meet his customers, at a particular time and place, and so a loss which the party sustained inevitably, in consequence of the defendant's failure to perform a binding contract upon adequate consideration. But the court held the damages not recoverable, because not in the contemplation of both parties, or the natural and ordinary result of the failure to perform the contract upon the basis of the facts known to the defendant, and upon which he assumed the obligation of the contract. This we regard as at present the settled rule of law, in regard to the allowance of special damages for the breach of contract. *Hamlin* v. *Great Northern Railroad*, 38 Eng. L. and Eq., 335.

It has been said, and may be true, that the defendants were aware of facts which made the loss and damages claimed inevitable to the plaintiff. But we can only say that we have to decide the case upon the facts found in the record. *Baxter* v. *Thompson*, 25 Vt. 505.

The damages which the plaintiffs are alleged to have sustained in manufacturing the ore delivered by the defendant and accepted by the plaintiffs after the expiration of time limited in the contract for the delivery, by reason of this ore not being suitable for manufacture by itself, and the damage to furnaces, and extra fuel, all come under the same rule already stated.

And it may also be said, in regard to much of this loss, that the plaintiff must so conduct his business as to sustain the least damage practicable, even if it were shown that the defendants were liable for the necessary portion of this damage by reason of knowing the process of the manufacture, and the object of procuring this Vermont ore, and its unfitness for manufacture, by

itself.   The plaintiffs should either have procured other suitable ore to mix with this, or, if that was not practicable, they might perhaps sell the Vermont ore to some party having the means of putting it to a proper use, or in the market generally.   They certainly could not in any event make the defendants liable for a loss which resulted from their own imprudence, and not for any loss of this remote character, unless they understood the particular purpose for which the ore was wanted, at the time of entering into the contract.

   Judgment affirmed.