### Franklin Deming et al. *v.* Grand Trunk Railroad Co.

In assumpsit against a common carrier, alleging that plaintiffs delivered to defendants a large quantity of wool, to wit, 7837 pounds, which they promised to transport; and the proof was of a smaller quantity : *Held* it was no variance.

Where the declaration states a delivery of the wool to the carrier at its depot to be transported immediately to a place named, and avers that in consideration thereof and of a certain reward the carrier promised, &c : *Held* that on receiving the wool under an arrangement previously made, a duty arose to transport it accordingly, from which the law will imply a promise to do so, and consequently there was no variance in the proof of the consideration.

An allegation of a promise to deliver the goods to plaintiff at Portland to be transported by another party to Boston, is to be regarded as a promise to deliver them in Portland simply, and for nothing beyond.

Several questions as to when interrogatories are leading, considered.

Under a general exception to the testimony of a witness it cannot be urged that it gives the contents of a letter, but the exception must be specific.

Testimony that the purchaser of the wool was informed, after the wool was shipped, that it would soon arrive, and that he was satisfied, is admissible.

Where goods are contracted to be sold at a price fixed, to be delivered at a particular place, and a carrier promises to transport and deliver them in due time, with full notice that the goods are sold if forwarded seasonably, the measure of damages for a breach of his contract by which the consignor loses the sale, is the difference between the contract price and the value of the goods when actually delivered.

Where a person testified that he was station agent at the depot of the railroad, and had full charge of receiving and forwarding freight there, although he testified that he had no authority to make contracts, and no control over the locomotive power of the road, it was held that a jury might legally find that the corporation held him out as their agent to contract for sending freight the next day.

Where there was a contract to carry freight at a particular time, proof that its transportation was prevented by an unexpected rush of freight is not admissible.

ASSUMPSIT.  Writ dated May 26, 1866.

The first count alleged that defendants were common carriers by railway from Northumberland, N. H., to Portland, Maine; that on February 22nd, 1866, plaintiffs at the request of defendants delivered to defendants at Northumberland depot, " certain goods and chattels, to wit, a large quantity of wool of the plaintiffs, to wit, seven thousand eight hundred and thirty seven pounds of wool, of great value, to wit, five thousand dollars, to be safely carried and conveyed by the defendants, by and on said railway, from the depot aforesaid at Northumberland aforesaid to Portland aforesaid, immediately and without delay, after said wool was so delivered by said plaintiffs to said defendants at said depot, to wit, by the next freight train of cars which should go over and upon said railway from said depot to said Portland after said delivery of said wool to said defendants as aforesaid ; and then, to wit, at said Portland, to be safely delivered by said defendants for said plaintiffs, to be thence transported and conveyed for said plaintiffs, by another party to Boston in the Commonwealth of Massachusetts.  It was then averred that " in consideration thereof and of a certain reward and compensation to be paid by said plaintiffs to said defendants in that behalf," defendants promised to carry the wool at the time and in the manner above stated, but that by breach of contract the wool was suffered to remain for some weeks at Northumberland depot, " whereby said wool was greatly damaged and depreciated in value, in price and in market, to wit, at the rate of twelve cents per pound ; and during the time of said neglect, delay and detention of said wool as aforesaid, the market value and price of the same fell and was greatly lessened and diminished, to wit, at the rate of twelve cents per pound, so that the plaintiffs were compelled to sell and deliver and did sell and deliver the same at a price less, to wit, twelve cents per pound less, than they would have obtained for the same if the said defendant had performed its promise and undertaking aforesaid ; and the plaintiffs had, to wit, on said twenty-second day of February, A. D. 1866, bargained and contracted said wool to be sold and delivered to a certain good and responsible party in said Boston, at the rate and price of fifty-six cents per pound, but by reason of said breach and non-performance by said defendant of its said promise and undertaking as aforesaid, said plaintiffs were unable to sell and deliver said wool to said party to whom they had bargained and contracted the same as aforesaid, according to their said contract, and were prevented from so doing, and were compelled to sell and deliver, and did sell and deliver, to another party at a less rate or price than fifty-six cents per pound, to wit, at the rate or price of forty-eight cents per pound, and were thereby compelled to pay and did pay (here follow expenses which are immaterial), and for other necessary expenses a large sum to wit, one hundred dollars."

The second count was substantially similar to the first, with the exception that the promise was alleged to be, to carry the wool " within a reasonable time " after its delivery at Northumberland depot.

The declaration is made a part of this case.

Plea, the general issue.

Plaintiffs' evidence tended to show that the quantity of wool delivered to defendants was less than seven thousand eight hundred and thirty-seven pounds. After the evidence on both sides was closed, defendants objected that this was a variance, but it was ruled, subject to defendants' exception, that the variance was immaterial.

There was evidence tending to show that in February, 1866, the plaintiffs had a quantity of wool stored at Lancaster, N. H., and at Northumberland, N. H. ; that on February 21, 1866, Baldwin, one of the plaintiffs, went to the defendants' depot in Northumberland, and that he found a young man in charge of the depot, (Cummings, the station agent, being absent.) Subject to defendants' exception, Baldwin was allowed to testify that he ascertained from the young man the rate of freight to Boston, and about the running of the train ; that he told the young man that plaintiffs had a certain amount of wool, that had been sold, contracted for, and that they were very anxious to have it go forward immediately, either by the White Mountains Railroad, or by the Grand Trunk Railroad, by whichever route was the quickest, and that the young man agreed to save two cars from the up freight train that afternoon, to be ready to load the wool upon the next morning for the down freight train.

After this evidence had been admitted, Cummings testified for defendants that the aforesaid young man was one Joseph Staples, who was baggage-master at that depot, and marked and checked baggage, and saw to loading and unloading freight; that he (Cummings) had full charge of receiving and forwarding freight at that station ; that when he went away he had other men there to see to things ; that these men received freight in his absence, but did not forward it ; that if he was to be gone a day or two there would be some one sent in his place ; and that, on February 21st, 1866, he was absent from the station only a few hours.

Baldwin further testified that, on his way back from Northumberland to Lancaster, on February 21st, he met Cummings, told him what he had done at the station, that the wool was bargained and must go forward, and that, if it could not go as arranged with the young man, to be sent up immediately the next morning, it must go the other way (i. e., via Littleton) ; that Cummings answered that it was "all right" and told him to "send up the wool"; that he (Baldwin) told Cummings, at this time, when the young man said it would be forwarded and about detaching two cars from the up train.

Subject to defendants' exception, plaintiffs were allowed to read the answer to interrogatory 15 in the deposition of Richard W. Bailey, stating that he was present at the interview between Baldwin and Cummings on February 21st, and testifying that Baldwin told Cummings he wanted the wool to go immediately to Boston ; that the wool was sold if it could go right in ; and if there was anything why it could not go right along he would send it to Littleton ; but if he could have it put right on to the cars, he would send it up there ; that Cummings told Baldwin to send it up and it should go without fail ; he told him to be sure and have it come up in the morning.

There was evidence tending to show that the wool was delivered to the station agent at Northumberland early the next morning, the sacks being marked " Wm. Greenough, Jr., Boston." Baldwin testified that Cummings gave him the rate of freight as 65 cents per hundred, and that he understood this to be the rate to Portland. Defendants' road terminates at Portland. When plaintiffs' evidence was closed, defendants objected that there was no evidence of the contract declared on.

Subsequently Cummings testified for defendants that, at the interview on February 21st, Baldwin asked him the rates to Boston ; that he told Baldwin the rates to Portland, and that goods not otherwise ordered were shipped by boat from Portland. After the evidence on both sides was closed, defendants objected that there was no evidence that defendants agreed to deliver the wool at Portland for plaintiffs to be conveyed by another party to Boston ; but it was ruled, subject to defendants' exception, that there was evidence on which the jury might find such an agreement.

Plaintiffs introduced the deposition of Selden A. Moore, the teamster who carried the wool from Lancaster to Northumberland on the morning of February 22. Subject to defendants' exception, plaintiffs were allowed to read interrogatory 13, and answer, viz :

Int. What, if anything, was the bargain between said Baldwin and yourself about loading this wool into a car?

Ans. I was to load it into a car together with that in J. A. Smith's store at the depot, if they furnished one.

This was admitted as tending to show diligence on plaintiffs' part to get wool off by next freight train, and it was expressly ruled that it was not evidence to show that Baldwin had made a contract with defendants to send it by that train.

Plaintiffs' wool at Northumberland was stored in Smith's store.

Interrogatory 14 in Moore's deposition was : State whether or not you put the wool in the Smith store aforesaid upon or into a car ; and if not, why not? What, if anything, did said Cummings agree to do about it?

This was objected to as leading and incompetent, but was allowed, subject to defendants' exception ; the court ruling, in the exercise of discretion, that, if leading, it might nevertheless be put.

Interrogatory 16 in same deposition was : Do you know whether this wool was sent off the next day after you drew it there, or the next day after you carried said letter to Cummings from said Bailey (February 22d, or February 23d,) according to agreement, or not? and if not, how long did it remain at said depot to your knowledge?

This was objected to as leading and incompetent, but was allowed, subject to defendant's exception ; the court ruling, in the exercise of discretion, that, if leading, it might nevertheless be put. The deponent had previously testified that Cummings had sent by him a verbal message to Bailey that he would send the wool the next day, if Bailey would send him the weight and the consignee's name. In answer to the last interrogatory he testified to the wool's remaining " several days." Defendants subsequently proved that it remained there at least as late as March 16th.

Interrogatory 3 in the deposition of William Greenough, Jr., was: What did you do for them (i. e. plfs.) regarding the last named lot, and at what time did you do it? Please state all the circumstances regarding it.

The following portion of the answer was submitted, subject to defendants' exception: "It was done in February and March. The transaction was as follows: They had previously shipped a sample of five bales, to represent the lot in question. February 5th, 1866, we were offered fifty-six cents a pound, cash thirty days, by the Atlantic Delaine Company, Providence, Rhode Island, for the lot of wool represented by the said sample bales delivered in Boston, which offer we reported on February 6, 1866, to Mr. Baldwin, of the firm of F. Deming & Co., of Wells River, Vt. ; also, not hearing from Mr. Baldwin, we wrote again on the 13th of February, to Mr. Baldwin, repeating the offer. Mr. Baldwin wrote on the 22d of February, saying that he had accepted the offer and had shipped the wool. In the mean time we had seen the purchaser of the wool, and had told him that the wool would soon arrive, supposing that the wool started on the date of shipment, and that the delay was only the ordinary delay of winter transportation ; this was satisfactory to the purchaser. On March 14th, 1866, we received a letter from the Atlantic Delaine Company, the purchasers, declining to accept the wool, for reasons stated in said letter, which is hereto annexed and marked "A." We wrote them again, saying the wool would soon arrive, and urging them to take it, to which they replied by letter, again declining to accept the wool, which letter is also annexed hereto, and marked "B." On March 20th, 1866, we telegraphed and wrote the plaintiffs, that their wool had not arrived and requesting them to hunt it up. The wool arrived in Boston on the 25th and 26th days of March, A. D., 1866."

Subject to defendants' exception plaintiffs were allowed to read letters "A," and "B," referred to in the above answer and annexed to the deposition :

## " A."

ATLANTIC DELAINE Co., Providence, R. I.

March 14th, 1866.

Mess. Greenough & Parker,

Gentlemen—I have your favor to hand of the 13th, and in reply would state that Mr. Chapen has ordered me not to purchase any wool at present, the market is so very dull that he does not feel disposed to purchase more at present, and also the party who have taken our rejected fleece are not wishful to buy more.

I am sorry not to be able to take this lot from you, but I will call upon you as soon as I am a buyer. Yours truly,

TOM MURFITT.

"B."

<div align="right">

ATLANTIC DELAINE CO., Providence, R. I.,

March 19th, '66.

</div>

Messrs. Greenough & Parker,

Gentlemen—I am sorry that I cannot take that lot of wool of you at present.

When I bid you the price for it we were very much in need of that class of wool, and we had also a contract with a party for the rejected wool. That contract held until about a week ago, and at present we are scarcely using any of that class of wool.

If I had had any idea that the wool would have been so long on the way I should not have bid you a price at it, as I wanted the wool for present use.

It is not our fault that it has been so long on the way, and it is not right that we should lose money on account of other people's negligence. It was the duty of the owner to notify the railroad that the wool had not arrived in season, and to have had it hunted up three weeks ago.

<div align="center">

Yours truly,                    TOM MURFITT.

</div>

Subject to defendants' exceptions, interrogatory 4 and answer in said Greenough's deposition were admitted as follows: Did the said purchaser accept the wool so contracted for, if not why was it not accepted? Ans. They did not, for this reason. In sales made to arrive, if the wool does not arrive, within a reasonable time, the buyer cannot be held, and in this case, the buyer urged that the market had declined materially, and further that, at that time, they had no use for the wool.

Subject to defendants' exception, the following portion of the answer to interrogatory 3 in the deposition of John D. Parker, Jr. was admitted, viz: "Yes sir, I know Mr. Deming and Mr. Wilder also. Greenough & Parker had samples of a lot of about eight thousand pounds of Vermont wool. Early in February of that year we showed the samples of this lot of wool to Thomas Murfitt, the buyer for the Atlantic Delaine Co. of Providence, Rhode Island. This wool and samples belonged to F. Deming & Co., of Wells River, Vermont. Murfitt offered us fifty-six cents a pound, one-third off for unwashed; cash in thirty days, for the whole lot, providing it came up to sample. We reported this offer to the owners, and they accepted it. The wool was in New Hampshire and not here, and we directed it to be shipped at once for Boston. This wool was sold, I think, on the 5th of February and did not arrive in Boston till into March; on the 20th of March it had not arrived, to the best of my knowledge. On the arrival of the wool a letter was written to Murfitt, or he was informed of the arrival of the wool, and he was asked to come and examine it and see if it was up to sample. He stated in a letter to us, the same annexed to the deposition of Mr. Greenough, and marked "B," that he could not take the lot of wool, on the ground that they were not using that

quality of wool, and he had orders to buy no more of it; and also he stated in conversation with me that at the time of the purchase, they were using that kind of wool, but since they had ceased to use it, and now they did not want it. The wool on its arrival was placed in a storehouse, and the firm of " Parker & Dupee" had an offer for the wool, I think 4th of April, either 4th or 6th of April, of forty-eight cents a pound, one-third off for unwashed, cash in thirty days, which offer was telegraphed to the plaintiffs. Mr. Wilder called on us on the 9th of April, and finally decided to accept this offer, and the wool was sold at that price, and the account of sales hereto annexed and marked " A." shows the sale as made.

Parker testified that the wool was as good as the sample. Subject to defendants' exceptions, interrogatory 7 and answer in his deposition were admitted, as follows : Interrogatory—For what reason did the Delaine Co. refuse to accept said wool? Answer—Because of the long interval between the time of purchase and the time of arrival.

Subject to defendants' exception, Baldwin was allowed to testify as to time spent and expenses incurred in going to Boston in the first part of March, 1866, to ascertain where the wool was and hasten its arrival.

Defendants offered to show that, owing to the approaching termination of the Reciprocity Treaty, there was at this time a great and unusual rush of freight over their road from Canada to the United States, and that the wool (which it was admitted was detained at Northumberland from February 22d to March 16th), was sent forward as soon as it could be ; and in this connection defendants offered to prove that they then had sufficient motive power, cars, and equipment, for the ordinary business of the road.

The court ruled that this evidence was inadmissible, unless defendants proposed to show that the plaintiffs were notified of this rush of freight, or that other circumstances were such that the plaintiffs might reasonably be held to have had knowledge of it, or that the rush of freight commenced after the wool was delivered at Northumberland. As the defendants did not intimate their intention to prove any of the last mentioned facts, the evidence offered was excluded, subject to defendants' exception.

Cummings, the station agent, testified for defendants that his duties in regard to freight were to receive, weigh, fill and get it off as soon as possible ; that he had no authority to make contracts ; that he went by the tariff; that he had no authority over the locomotive power of the road ; that the superintendent could say when cars should be left, and the superintendent or assistant superintendent could direct conductors to take those cars ; and that he (Cummings) never agreed to send any freight (except live stock) at any particular time.

On cross-examination he testified that he had a book of directions from the Railroad Company of some two hundred pages, and that he also received on the average about two circulars from the company every week ; and that all his instructions were either in the book or the circulars. The book and circulars were neither called for by plaintiffs, nor produced by defendants. Cummings further testified that he had full charge of receiving and forwarding freight at that station.

The jury were instructed, among other things, that a contract is binding on a corporation; 1st, if made by an agent who has been in fact authorized by the corporation to make it; or, 2d, if made by an agent who, though having no authority in fact to make such a contract, has been put by the corporation in such a position of trust, or has in any manner been so held out by the corporation, as that the other contracting party might reasonably believe, and did believe, in consequence of the way in which the corporation held out the agent, that he had authority from the corporation to make such a contract; that whether Cummings made any contract, and whether, if he made one, it was binding on the defendants, were both questions of fact to be determined by the jury under the above instructions as to the law; and that the jury in determining these questions would consider whether the defendants, at that time, held out their station agent at Northumberland as authorized to contract for sending freight the next day, and whether the defendants clothed the station agent with powers calculated to induce the plaintiffs to believe that he had due authority to make this contract. In this connection the jury were instructed that an implied agency does not extend beyond the obvious purposes, general usage, scope, and course, of the business for which it is apparently created.

The jury were also instructed, that if they found for the plaintiffs, and believed Baldwin (who had testified that he told the station agent that the wool was bargained and must go forward), and found that there was a contract with the Atlantic Delaine Company for the sale of the wool, they might give the plaintiffs any damages (over and above the difference in the market value at the time the wool should have arrived, and the time when it did arrive), which plaintiffs had sustained, owing to defendants' delay, by the loss (if the jury found there was such loss), of the chance to sell to the Atlantic Delaine Company; and that they should give interest on this amount from the time of the Delaine Company's refusal.

(The jury were instructed to give no damages for the loss of the chance to sell the sample bales.)

The jury were also instructed that they might give the plaintiffs, as damages, their expenses in looking up the wool, so far as these expenses were occasioned solely by, and were the natural consequence of, defendants' delay, with interest on these expenses from the time when they were incurred.

To the above instructions defendants excepted.

The jury returned the following informal verdict in the form suggested to them by the court (to be used if they found for plaintiffs and found damages for the items claimed by plaintiffs) :

" The jury find a verdict for Deming, Baldwin & Wilder, and assess damages for the difference in the market value at five hundred forty-two dollars and eight cents, ($542.08.) They assess further damages beyond the above for loss of chance to sell to Atlantic Delaine Company at one hundred and forty-six dollars and ten cents ($146.10.) They assess further damages for plaintiffs' expenses to, from and at

Boston, occasioned solely by defendants' breach of contract, at thirty-four dollars and seventy-five cents, ($34.75)."

The jury also returned with the informal verdict an affirmative answer to the following question put to them by the court:

"Did Cummings make a contract with plaintiffs, binding on the Railroad Company, to forward the wool by the next freight train?"

A formal verdict was taken for plaintiffs for $722.93, with leave to file a remittitur for any amount which plaintiffs may hereafter desire.

Defendants move to set aside the verdict on account of the foregoing exceptions.

*Hibbard & Carpenter* for plaintiffs.

*Fletcher & Farr* for defendants.

BELLOWS, J.   In this case it is objected that there is a variance between the amount of wool delivered to the defendants, as alleged in the declaration, and the amount proved; the allegation being that a large quantity of wool of the plaintiffs, to wit, 7837 pounds, was so delivered, and the proof being of a smaller quantity.   The inquiry is, then, whether the plaintiff was bound to prove the precise amount laid in his declaration; and this must turn upon the question whether the amount so stated is material and traversable or not.   If it is, the consequences of a variance will not be avoided by the fact that the allegation is under a *videlicet.*   On the other hand, if the matter is not material, the party is not concluded by the allegation in this form; 1 Ch. Pl. 10th Am. ed., 317, 318, and cases; 2 Saund. 291 c. note, where it is said by Sergeant Williams that if a party does not mean to be concluded by a precise sum or day stated, he ought to plead it under a *videlicet*, for if he do not, he would be bound to prove the exact sum or day laid.

In the present case the action is brought to recover damages for not transporting in due time a large lot of wool, to wit, 7837 pounds, of great value, to wit, $5000; and it is obvious from the form of the allegation, that the pleader did not intend to bind himself to the precise amount of wool, or its value, as stated under the *videlicet.*

Had the declaration stated the contract to be that defendant would transport that precise amount of wool, proof of a different amount might have been a variance, as being a different contract in fact; but no such thing is stated here.   The material allegations are that plaintiff delivered to defendant a large quantity of wool which the defendant agreed to transport, &c.; and what is said about the weight and value is much as if stated as matter of estimate, and not as a material part of the contract.   Besides the variance suggested is not that the contract was to transport another and different quantity of wool, but that the quantity delivered was less than the quantity stated.

It is very clear, we think, that the precise quantity delivered was not a material allegation; and no issue could be taken upon it, any more than upon the allegation as to value.   The declaration is in the ordinary form in suits against common carriers; and we find nothing that

gives any countenance to the idea that the plaintiff must prove the weight and value of the goods, precisely as alleged, although stated under a *videlicet.*   Such a doctrine would be attended with great inconvenience, amounting in many cases to almost a denial of justice.

In *Hamer* v. *Raymond & al.*, 5 Taunt. 789, it was held, in an action on the case for running foul of posts in the river supporting the plaintiff's wharf, that it was not necessary to prove the posts or wharf to be at the place at which they were, under a *videlicet*, alleged to be situate.

The next question respects the statement of the consideration.   The declaration states the delivery of the wool at the Northumberland depot, to be safely carried and conveyed from that depot to Portland, immediately and without delay, to wit, by the next train of cars, and there, to wit, at said Portland, to be delivered by said defendants for the plaintiffs, to be thence transported by another party to Boston ; and it is then averred that in consideration thereof and of a certain reward and compensation to be paid by the plaintiffs to the defendants in that behalf, defendants promised to carry the wool at the time and in the manner above stated.   A second count is substantially like the first, except the promise is alleged to be to carry the wool within a reasonable time after its delivery at the depot.

The exception is that there was no evidence of the contract declared on ; and the defendants urge that the proof shows the contract, so far as any was made, to have been made before the wool was delivered at the depot, and also that there was no proof of a promise to deliver the wool in Portland to be transported by another party to Boston.

The point of the first objection is that the consideration in the promise is not proved as laid ; that the previous delivery of the wool to be carried to Portland was laid as the consideration in part for the promise, while the proof was only of a promise made before the wool was delivered.

The declaration states a delivery of the wool to the Railway Company at its depot, to be carried to Portland without delay, and by the next freight train of cars ; and that in consideration thereof, and of a certain reward to be paid, the defendants promised so to carry it ; and the question is whether there was any evidence of such a contract.   To prove that, it was necessary to show not only the promise but the consideration as laid.

It would seem that there was evidence tending to support the second count, which was on a promise to carry and deliver the goods in a reasonable time, because if no time is specified the law implies an undertaking to do the service in a reasonable time.   But the jury may have found for the plaintiffs upon the ground that the promise was to carry the goods by the next freight train without considering the question of reasonable time ; and therefore it is necessary to consider whether there was evidence tending to sustain the first count.

If there was no evidence tending to prove that the previous delivery of the wool, at defendants' request, was a part of the consideration for the promise, then the exception would seem to be valid ; but we are inclined to think that there was evidence on which the jury might have

found a promise after the wool was delivered. There certainly was evidence tending to prove that the wool was delivered to be carried by the next train of cars, and that defendants agreed so to carry it; and upon receiving it a duty arose on the part of the defendants to carry it accordingly, from which the law would imply a promise to perform the duty.

In *Streeter* v. *Horlock*, 1 Bing. 34, which was assumpsit against a carrier for not delivering goods according to contract, one count stated a promise made upon a past consideration, viz., that plaintiff *had caused* to be shipped at defendant's request certain goods, whereas by the evidence it appeared that defendant had engaged to carry and deliver the goods, before the goods, or at least before the whole of them, had been actually shipped, and it was therefore urged on the part of the defendant that the consideration ought to have been stated in an executory form, viz., that the plaintiff *would cause* to be shipped, &c.

But it was held that the count might be supported in its present form; Parke J., laying it down that whenever, as in this case, an order is given previously to the delivery of goods to a carrier or other bailee to deal with them in a particular manner, to which he assents, and afterwards the goods are delivered to him accordingly, a duty arises on his part, upon the receipt of the goods, to deal with them according to the order previously given and assented to; and the law infers a promise by him to perform such duty. "In the present case," he says, "the promise might have been stated as a promise by the defendant to do his duty in that behalf, which would have been a more concise mode of stating that which is in effect stated."

The doctrine of this case is decisive of the question here, and we are disposed to regard it as sound. It is in fact like many other cases, where, upon the execution of the consideration, a duty remains, as to pay money; and the law implies a promise to perform such duty, and it may be enforced by an action of assumpsit in some general form.

The other exception is that there was no proof of any promise to deliver the wool in Portland to be transported by another party to Boston. On that point we do not understand that there is any allegation of a promise to carry the goods to Boston, but simply to deliver them in Portland for the plaintiff. The statement that they were to be transported from thence to Boston is to be regarded not as stating an obligation by defendants to take them there, but simply as a statement of the object of plaintiffs in having them carried to Portland, viz., to get them to Boston where a sale of them had been made and they were to be delivered. There was evidence tending to prove that such was the fact and that the agent of the defendants had notice of it. We are of the opinion, then, that there was no variance on this ground.

The exceptions to 15th interrogatories in the deposition of Richard W. Bailey, and the 13th in the deposition of Selden A. Moore, do not appear to be insisted on and we are not aware that they are objectionable.

Interrogatory 14th in Moore's deposition is not, we think, leading. He was asked if he put the wool into the car, and if not, why not, and

what, if any thing, Cummings agreed to do about it. From the tenor of the inquiry the purpose appears to have been to ascertain why the wool was not loaded into the cars, and especially what Cummings, the station agent, had agreed to do about it, if anything. The first part of the question as to what the witness himself did or did not do, and the reason for it, is not objectionable, very clearly, we think; and the other part would seem to be equivalent to the inquiry whether Cummings agreed to do any thing about it, and if so what, and that is clearly not leading.

In some cases, a form like the one adopted here might be open to the objection of suggesting that some agreement had been made, or other thing done, and in all such cases the question ought to be disallowed; but we do not perceive that in this case the witness was likely to be led by the form of the question; had any particular agreement been indicated it might have been objectionable.

We think the 16th interrogatory in Moore's deposition is not leading. There is no ground to suppose that the question was designed to lead to an answer that the wool was sent on either of the days named in the question, for the plaintiffs' case must have gone upon the ground that it was not sent until many days after that, and so it appears from the defendants' testimony; and yet if the question has any tendency to lead the witness, it must be in a direction unfavorable to the party putting the question.

The substance of the inquiry is whether the wool was sent the day after it was drawn to the depot, or the next day, and if not, how long it remained there to the witness's knowledge, and we think there was nothing in the form of the question to lead the witness to the prejudice of the defendants.

The exception to the answer to the third interrogatory in the deposition of William Greenough, Jr., is mainly that he states the contents of letters written by himself and the plaintiffs. It does not, however, appear that the exception taken at the trial was put upon that ground, specifically, but was general, and it is therefore well settled that it cannot avail the defendants. Had the objection been specific, it might have been removed by the production of the letters, and it is too late after the trial to make it. *Carter* v. *Beals*, 44 N. H. 408, and cases cited.

So we perceive no objection to the witness's statement to the purchaser of the wool that it would soon arrive, and that the purchaser was satisfied. The purchaser could not be regarded as a third person merely. It was proper that he should be informed as to the time when the wool might be expected to arrive, and the conversation tends to show a recognition at that time of the contract of sale. The statement by the witness that the information was satisfactory to the purchaser was equivalent to saying that he made no objection or that he expressed himself satisfied. This objection is rather a formal one and ought to have been specifically made. This conversation with the purchaser tends also to show an assent to the sale after notice that the proposition was accepted by the plaintiffs, and that the goods were shipped; and thus

might remove any objection that otherwise could have been made on account of the delay in accepting the proposition, and for that reason was clearly competent.

The evidence tends to show an offer for the wool by the Atlantic Delaine Company of fifty-six cents per pound, an acceptance of that offer by the plaintiffs, and a subsequent recognition and assent by the Delaine Company; and we think the jury could legally have found a binding contract of sale, unless it was made to appear that it was invalid within the statute of frauds for want of a writing. But as that objection was not taken at the trial, nor urged in the argument, we need not consider it here. Besides it does not clearly appear that 'the contract was not in writing.

The answer of Mr. Greenough to the fourth interrogatory in his deposition is not objectionable on account of his reference to what he supposed to be the law. If it was correct it could do no harm. If not, the court would correct it; and his statement of the purchasers' reasons for not taking the wool cannot now be objected to even if derived from the correspondence, because that objection was not taken at the trial.

The same may be said in respect to the answer of John D. Parker to the third interrogatory in his deposition. *Carter* v. *Beals,* 44 N. H. 408, before cited.

Another question has respect to the instructions to the jury upon the subject of special damages arising from the loss of the sale to the Delaine Company. It is urged by the defendants that such damages could not be included, because no binding contract of sale was shown; but for the reasons already suggested we think the jury might have found a valid contract. The defendants also argue that, if there had been a valid contract, damages could not have been given for the loss of it. This raises the question whether the carrier of goods which he undertakes to transport, is liable, under the circumstances of this case, for damages arising from the loss of a sale when caused by his delay in delivering the goods.

On this point the evidence tended to prove that the plaintiff, having a lot of wool which he had contracted to sell at fifty-six cents per pound, to be delivered in Boston, called upon the defendants' agent at Northumberland station, and stated to him that he had a lot of wool that he had sold or bargained, deliverable in Boston; that he wanted it to go immediately to Boston, and that it was sold if it could go right in; that he wanted it to go by the White Mountains Railroad, or by the Grand Trunk Railroad, whichever route was the quickest; that he was told by the agent that he would provide two cars for the wool to go by the freight train next day; that the agent told the plaintiff to send up the wool the next morning and it should go without fail. That plaintiff did send the wool the next morning, but that defendants did not forward it until as late at least as March 16th, the arrangement about it having been made on the twenty-first day of February, 1866. The evidence also tends to show that the purchaser declined to take and pay for the wool, assigning, among other reasons, that it had been so long on the

way ; and the plaintiffs thereupon sold it to other parties at a diminished price.

No objection is made to the sufficiency of the notice that the wool was contracted to be sold deliverable in Boston, and that plaintiffs desired it to be forwarded immediately on that account; and the jury have found that the station agent made an agreement binding on the defendants to forward the wool by the next freight train. Upon this testimony we think it was competent for the jury to find that by the breach of the defendants' agreement the plaintiffs lost the sale to the Atlantic Delaine Company, and were obliged to sell the wool for a diminished price.

The inquiry, then, is whether for this loss the defendants may be charged. This subject has of late been much discussed on both sides of the Atlantic. The leading English case is *Hadley* v. *Baxendale*, 9 Exch. 341, where Alderson, B., after great consideration, lays it down as a general rule that " where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, that is, according to the usual course of things, from such breach of contract itself ; or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it."

The action here was against the defendants as common carriers for not delivering seasonably a broken iron shaft sent to the manufacturers as a pattern for another for plaintiffs' mill, and it was held that the plaintiffs were not entitled to damages for the loss of profits while their mill was stopped in consequence of defendants' delay ; notwithstanding the plaintiffs' agent told the defendants' clerk when the shaft was sent to them that the mill was stopped, and the shaft must be sent immediately, and the clerk replied that it would reach its destination the next day. The opinion of the court was that this was not notice of such special circumstances as would lead the defendants to contemplate such loss of profits as a natural consequence of a delay in forwarding the shaft, inasmuch as, for aught that was said to defendants, the plaintiffs might have had another shaft ; or there might have been other defects in the machinery that would have stopped the mill. The verdict which included such profits was therefore set aside. The court, however, held that if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.

The general doctrine of this case, which was decided in 1854, has been recognized and followed in both the English and American courts, and is regarded as a leading case. Sedgwick on Dam., 4th ed., 81 to 84, notes and cases, and also p. 406, 409. See, especially, cases collected on p. 81. *Copper Company* v. *Copper Mining Company*, 33 Vt. 92.

In *Griffen* v. *Colver*, 16 New York Rep. 489, 494; the subject was carefully considered and the opinion given by Selden, J., who laid it down that the broad, general rule in such cases is that the party injured is entitled to recover all his damages, including gains prevented as well as losses sustained; and this rule is subject to but two conditions: "The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, must be such as might naturally be expected to follow its violation; and they must be certain both in their nature and in respect to the cause from which they proceed."

In 2 Kent's Com. 480, in note, it is laid down that "damages for breaches of contract are only those which are incidental to, and directly caused by, the breach, and may reasonably be supposed to have entered into the contemplation of the parties, and not speculative profits or accidental losses, or the loss of a fancied good bargain."

In *Blanchard* v. *Ely*, 21 Wend. 342, the court recognizes the doctrine laid down in Evans' Pothier, London ed., 1806, in these words: "In general the parties are deemed to have contemplated only damages and interest, which the creditor might suffer from the non-performance of the obligation in respect to the particular thing which is the object of it, and not such as may have been accidentally occasioned thereby in respect to his other affairs;" and the court quotes the illustrations of Pothier, that, in the case of the failure of title to land demised, the lessor would not be liable for the loss of custom in a business established by the lessee while residing there, although he would be bound to pay the lessee the expense of removal; but that a party may incur liability for extrinsic damages if it appear that they were stipulated for, or tacitly submitted to in the contract,—as if a party stipulate to deliver a horse in such time that a certain advantage may be gained by reaching a certain place,—when for a default the party shall pay for the loss of such advantage; and, as an instance of a tacit submission, the case of demising premises expressly for use as an inn is put, and there, it is said, that if the tenant is evicted for want of title, the loss of custom may be taken into account.

These illustrations furnished by this eminent writer accord substantially with the rule laid down in *Hadley* v. *Baxendale*, and the provision of the French code, as stated by Sedgwick in his work on Damages, p. 67, is also in accordance with that rule. The substance of it is that "the debtor is only liable for the damages foreseen, or which might have been foreseen, from the breach of the contract." And Parke, B., in *Hadley* v. *Baxendale*, said that was the sensible rule.

It now must be considered as settled both in the English and American courts, that for the breach of a contract to transport goods, the consignee may recover damages for the depreciation of the goods in market during the delay; that is, the difference between the market price when and where they should have been delivered, and when they were actually delivered. Sedgwick on Dam., 75, 78, and 356, 360, and cases; 2 Red. on Rail., 166; *Griffen* v. *Colver*, 16 N. Y., 491. And it is obvious that this is in the nature of general damages, as in contracts for

the sale of goods, and need not be set out specially in the declaration; see *Collard* v. *Southeastern Railway Company*, 7 H. & N. 79, cited in Sedgwick on Damages 407, in notes; and see *Stevens* v. *Lyford*, 7 N. H. 366. The question, then, is whether the consignee may also recover damages for the loss of a sale which he had previously contracted for, and which he communicated to the carrier, when that loss was caused by a breach of the carrier's contract. The authorities very generally agree that the plaintiff can include in his damages only such as are the direct, immediate, and natural consequences of the breach of contract; such as flow directly and naturally from such breach, and are not remote, speculative or contingent.

There is difficulty in determining, sometimes, what are, and what are not, the direct, immediate and natural results of the breach complained of. But we think that the decisions which allow, as damages, the difference between the market price of the goods at the time and place when and where they should have been delivered, and the market price when they were in fact delivered, must govern this case.

There it is assumed that if the goods had been delivered to the consignee, according to the contract, they would have been worth to him as much as the then market value, because he could have sold them at that price; and, of course, it is assumed that the injury is the direct, immediate and natural result of the carrier's breach of contract. Such an injury must have been foreseen, and in the contemplation of the parties when the contract was made. It would be so equally in the case of a previous sale of the goods, which was communicated to the carrier when he received them, and when the contract was entered into for the express purpose of enabling the seller to complete the sale.

In such a case the loss would be the difference between the price at which the goods were bargained, and the price the consignee was enabled to sell them for in market, and the loss would be the direct, immediate and natural result of the carrier's breach of contract as in the other case.

In the one case the difference in the market price is the measure of damages, because it is assumed that the consignee could certainly have sold them at the market price, had the goods been delivered in due time. In the other case the sale was already made and the price fixed, and had the goods been delivered in due time the consignee would have received that price for them as surely as in the other case he would have obtained the market price; and even more surely, because he might not have chosen then to sell.

The damages for the loss of a sale would fall under the denomination of special damages; and, without notice of the fact of such sale, it could not be understood that such a loss would have been foreseen or contemplated by the parties. It is proper that the carrier should understand the extent of the responsibility he assumes, and the consequences of a failure on his part; and if no special circumstances are communicated to him he ought to be held responsible only for the consequences which might ordinarily be supposed to flow from his breach of contract.

In this case the plaintiff's evidence tended to prove that he informed the defendants' agent that he had a lot of wool that was sold if it could go immediately to Boston, and that if it could not go at once that way he should send it by another railroad, and that the agent told him to send it the next morning, and it should go by the next freight train. Under these circumstances the jury might have found that the contract was entered into for the express purpose of enabling the plaintiffs to complete their contract of sale, and we think the defendants ought to be charged with the loss occasioned by the breach of their contract. *Griffen* v. *Colver*, 16 N. Y. 493.

In the cases of sales with warranty, or contracts to sell and deliver goods, it is often held that the vendee cannot recover damages for the loss of a contract of resale, arising from the breach of warranty or the failure to deliver the goods. *Clare* v. *Maynard*, 6 A. & E. 519; *Masterton* v. *Mayor of Brooklyn*, 7 Hill 68, and cases cited.

In these cases, however, it does not appear that the contracts were made with any reference to a resale, and therefore they could not come within the principle we have been considering. But a very different case is presented where the contract is entered into for the express purpose of enabling one party to complete a sale, or to obtain some other advantage, and it is so understood by both parties. In this respect the illustrations given by Pothier, before referred to, are in point. In such cases the special damages are deemed to be within the contemplation of the parties.

In the recent English case of *Berries* v. *Hutchinson*, 18 C. B. (N. S.) 445, which was a contract to sell and deliver to the plaintiff a quantity of caustic soda, which was designed for sale in Russia, and the defendant knew it was designed for a foreign market, and before the time of delivery he knew it was to be sold in Russia; it was held that defendant was liable for the loss of the profits on the resale in Russia caused by defendant's failure to deliver the goods according to his contract, and to the additional cost of freight.

So where defendant had agreed to deliver to a farmer a thrashing machine at a time fixed, knowing it was to be used to thrash wheat in the field, and by his failure to deliver it, the wheat was injured by the rain, it was held that defendant was liable for the injury since the parties might well have anticipated such injury to result from the breach of the contract. *Smeed* v. *Foord*, 1 Ellis & Ellis 602, cited in Sedgwick on Damages 81, in note; see also cases collected in Sedgwick on Damages, 4th ed., 333, 335; among them, *Randall* v. *Raper*, 1 Ellis, B. & Ellis 84, (96 Eng. Com. Law 82), where defendant sold the plaintiff some barley, warranting it to be " Chevalier seed barley," and plaintiff sold it with similar warranty upon the strength of defendant's warranty, and it proving not to be that kind of barley, it was held that defendant was liable for what plaintiff was bound to pay his vendee. See also *Waters* v. *Towers*, 8 Exch. (W. H. & G.) 401, and *Woodbury* v. *Jones*, 44 N. H. 206, and cases cited.

Upon these views we think there was no error in the instructions to the jury in respect to damages for loss of the sale to the Delaine Com-

pany. Nor do we think there was any error in the instructions as to plaintiffs' expenses in looking up the wool. Sedgwick on Damages 359, in note and cases cited, 4th edition. The objection in fact is not urged by counsel.

The instructions in respect to the authority of Cummings were sufficiently favorable to the defendants. He was the station agent at the Northumberland depot, and he testified that he had full charge of receiving and forwarding freight at that station; and although he also testified that his duties in regard to freight were to receive, weigh, fill and get it off as soon as possible and that he had no authority to make contracts, and no authority over the locomotive power of the road, and that he never agreed to send any freight, except live stock, at any particular time, we think the jury might legally find that defendants held him out as their agent authorized to contract for sending freight the next day.

This was the substance of the instructions on this point, and we think there was no error. If, for the convenience of the corporation, Cummings was voluntarily placed in a situation of apparent authority, and so held out to the public as competent to make the contract in question, the defendants will be bound, although the agent had in fact exceeded his authority, and even if the defendants were entirely innocent of any purpose to mislead; for when one of two innocent persons is to suffer, he ought to suffer who misled the other into the contract by voluntarily placing the agent in a situation of apparent authority.

In this case the agent was apparently clothed with the sole charge of receiving and forwarding freight at that depot, and it might well be supposed to be within the ordinary scope of his duties to make agreements as to the time of forwarding such freight. If such power was possessed by any one at that depot it must have been by him, and we think the jury were well warranted in finding as they did.

In 2 Redfield on Railways 113, it is laid down that station agents who receive and forward freight have power to bind the company that the goods shall be forwarded to a point beyond the terminus of that road before a particular hour, notwithstanding a general notice published that the company would not be liable beyond their own road; and so is *Wilson* v. *York, New Castle and Berwick Railway*, 18 Eng. Law. & Eq., 557; Story on Agency § 443, 127; *Backman* v. *Charlestown*, 42 N. H. 125, 131, 133; *Burnside* v. *Grand Trunk Railroad*, 47 N. H. 554.

In respect to the first count, the evidence offered by defendants as to the unexpected rush of freight was properly rejected; and the jury having found a binding contract to carry the wool by the next freight train, the verdict will not be disturbed, even if the evidence were admissible under the second count. When the carrier contracts to carry goods within a prescribed time, no temporary obstruction or even an absolute impossibility of complying with the engagement will be a defence to an action for failing to perform his engagement; for when a party by his own contract creates a duty or charge upon himself he is bound to make it good, notwithstanding any accident or delay by in

evitable necessity, because he might have provided against it by his contract. It is otherwise, however, when the duty is created by law. Angell on Carriers § 294, and cases in note. So it is held in 2 Red. on Rail. 162, in note and cases. The same doctrine is laid down in *Hadley* v. *Clarke*, 8 T. R. 267, per Lawrence, J.

With these views there must be

<div align="right">

*Judgment on the verdict.*